If you support our Margaret Loop Council for the National Labor Relations Board, I'd like to reserve about two minutes for rebuttal. In this case, the board seeks reversal of the district court's order and entry of judgment, granting the reinstate the injunctive relief requested, including the reinstatement of eight employees, the rescission of unlawful personnel actions, and a cease and desist order. In this case, I'd like to focus on two main issues. Whether the board showed a strong likelihood of success on the merits, thus warranting the presumption of irreparable harm. You're just, you're assuming that Miller applies and not the other case, right? Yes, that's correct. And why is that? Because there's no risk of First Amendment infringement here, and the Overstreet test applies when there is some risk of First Amendment infringement. There's no risk at all of First Amendment infringement. The board's order requires, or rather the injunctive relief requested by the board's regional director only requires the reinstatement of the discharged employees. I appreciate your position, and I'm trying to understand exactly how you get there. As I understand it from looking at the record, the entire basis for the union commencement revolved around journalistic ethics. Is that incorrect? Well, the employees were concerned about a number of things in the workplace that had arisen. Primarily, the motivating, precipitating factor had been the resignation of a number of editors and employees. But they resigned because of what? They were concerned about the employers increasing, merging, or ignoring the wall between editorial opinion and straight news reporting. Exactly. And that is really the genesis of this entire action, is it not? But the employees' interest in union representation does not fall on the nature of the request they make of an employer. And here, they requested repeatedly not only return to what they call journalistic integrity, but also recognition of the union, which they did select in their board election, and collective bargaining. And the employees, during the organizing campaign, did review other collective bargaining agreements in which employees were able to address their concerns that were similar to these employees' concerns in that they wanted to protect themselves from arbitrary discipline. And I appreciate that. And I would readily agree that when you look at the record that the ALJ made, there were certainly some more traditional types of violations of the rights of these folks in the formation of the union. And I don't, you know, we to some degree are following what the ALJ said. But would you not agree that there is some tension here, based upon the underlying basis for forming this in the first place, that maybe, I know you don't feel this way, but that maybe brings this First Amendment issue into the picture? Well, the board doesn't believe so, Your Honor, because the employees here were seeking control over their working conditions. Let me just back up. What's working conditions? What extent does it have to do with content of the newspaper? They are not asking for, and neither the board is not asking for, an order that requires the employer to cede editorial control here. Employees are, or rather, the board is only seeking an order that requires reinstatement of these employees. Does the government have the power to go to the New York Times and say, you've got a dozen people here, they're good reporters, hire them? No, just not on those schedules. Obviously not. But isn't there some connection between who's doing the writing and what writing gets produced? Your Honor, since more than 70 years ago, in an Associated Press case. Is Associated Press about content? Was there a dispute there? Did it have anything to do with journalistic integrity or maintaining the firewall between the publisher and the editorial staff? The employee there was discharged for his union activities. And the reinstatement did not, as here, it would not. But was the grievance there? I mean, it's very easy to understand that a newspaper is not immune. And newspaper employees have rights like other employees. And they can bargain collectively for wages, for hours, and so forth. When the core of the organization and the core of the employee's concern appears to be editorial content, don't you have at least some need to give some consideration to First Amendment interests? But the employees, the organizing campaign does not rise or fall on the nature of the demand that employees make. Why not? Because there's no case that says just what employees say. Do you have any case that says that the editorial content is okay to affect editorial content just because it grows out of a labor dispute? No, and we're not saying here that the employees are seeking that the employee receive editorial control to them. And in fact, the employees were concerned about the loss of managers who would be on both sides. The firewall has managers on both sides of it. Let me ask you this. If the shoe were on the other foot, if the newspaper owners were trying to seek concessions from their employees about their First Amendment rights, would the employer lose its labor relation protections? The employer, I can't imagine a circumstance like that, Your Honor. Well, that's the nature of hypothetical questions. I'm just asking if the shoe were on the other foot, would the employer forfeit its labor relation protections because of the nature of the dispute that gave rise to the employees' wish to be represented? Well, employers and unions can bargain over anything that they choose, and no employer is ever required to agree to any particular demand by a union, and neither is a union during collective bargaining required to agree to any employer demand. Of course, this is not a bargaining case. This is just a simple discharge and request for reinstatement of the employees. And in no way would the employer be required to publish anything against its will, as in the Miami Herald case. In here, all that we're asking for and all that the petition sought was the reinstatement of the employees who were unlawfully discharged. Did the ALJ find that some or all of these discharges were pretextual? The reasons articulated were pretextual? The first two employees were discharged for the stated reason of bias, and the ALJ found that that was pretextual under all the circumstances. They were highly regarded employees. They'd never been disciplined for bias or any other reason. They were open and active union supporters, and the employer's stated reason of bias did not withstand scrutiny. Again, none of... Who should, could an employer, could a publisher discharge a reporter on the ground of bias? If the employer can discharge any employee for any reason... Okay. Now, whose judgment would it be if a publisher decides to discharge a reporter because the publisher believes that the reporter's work is biased, does the publisher ordinarily have to justify to somebody else that bias? Do you have to prove to some objective observer that the work was biased? Well, only if it's in the connection, in this case, as it is with a union organizing drive, and you look as you would with any employment discrimination case. So in this case, you had the ALJ making an evaluation as to whether he thought the reporter's work was biased. Is that correct? He's looking at all of the circumstances, and he's looking at the stated reasons for the discharging. Firstly, one employee had published four articles in October, and one of those articles had even been approved for publication by a supervising editor who later discharged her. So none of those articles were ever alleged to be biased. And in fact, no article here can be published without review by at least one editor, and one of the things they always look for is bias. So under all the circumstances, the timing, the open nature of the employee's activity in support of the union, and the protectable nature of the employer's justification for their discharge, as to those first two employees, the ALJ showed, or found, rather, that they were unlawful discharges. The district court found, this is on page 16 of the order, referring to the fact that the very first demand of the group seeking the union formation was, in quotes, restore journalism ethics to the Santa Barbara News Press, implement and maintain a clear separation between the opinion-slash-business side of the paper and the news-gathering side. The court further found that these demands were repeated or displayed at union-led demonstrations on five separate dates prior to the union election. And then the court found, on lines 22 through 26, that the ALJ did not make any finding that the first demand, the one I read, relating to journalism ethics, was ever retracted. Do you agree that it was never retracted? No, it was never retracted. That was one of the three demands that the union and the employees... And it remains, does it not? Yes, it does remain. Okay. And again, the employees' interest in journalistic integrity could be a determined condition of employment, as the ALJ found here. But could it also be a subject of First Amendment concern, because it speaks directly to what content is printed in the newspaper? If the order were seeking control over the content of the... Well, if you're telling the newspaper who it has to hire as reporters and editors, don't you think that has some influence on the content? No, it goes back to the Associated Press case. An employer cannot discharge employees for their union activities. But an employer can discharge somebody on the grounds of bias, or I just don't like your writing. Yes, that is true, Your Honor. So here you have an effort to second-guess the publisher's judgment with regard to perceived bias on the part of the reporters. But that is true in any labor relations, any case under the Act, or any employment discrimination case. The reviewing court has to look at what was the stated reason for the termination, what were the circumstances, what were the timing, what was the knowledge of the employer making the discharge. So in any case where the discharge is alleged to be unlawful, the reviewing court and the ALJ here had to review the stated reasons for the termination. You wanted to save some time for rebuttal? Yes. You're afraid to use the time in the way you wish? I'll just go quickly to the other six employees. Can I just ask one, please? Because this, at least to me, this is important. One of the people that's being asked to be rehired is Ms. Burns. She, and this is on the record, 813, says, I've decided not to walk away from the fight to restore journalistic integrity for the news press. This, by the way, was to the news press colleagues and friends. Once proud, but now disgraced institution. And then she said, we have powerful allies in our campaign to build back the wall between the opinion and news in the paper, referring to the union. We, in quotes, we desperately need a legally binding document that sets down the rules of journalistic ethics. Isn't that exactly the reason why the union has not removed this demand? They want a document that would set out in writing, as part of the negotiation, a document that would, in fact, require the wall between journalism and the editorial function. Employees can in their union. I'm not saying they can't do it. I'm just saying, but this is part of that menu, is it not? Yes, they want to, a collective binding agreement that protects them and permits them to, for example, protect their byline. And does that not go to the First Amendment? Can you finish the answer? As in other collective bargaining agreements that they reviewed during the organizing drive, some collective bargaining agreements include a protection that allows employees to, for example, remove their bylines from an article before it's published, if they feel it doesn't report that which they reported, and also preserves their reputation so that it protects their sources so they can continue to do their job. And that is one of the protections that they looked at, the employees looked at here when they were reviewing other collective bargaining agreements. So that directly governs what gets printed by the newspaper? I'm sorry, sir? Doesn't that directly affect what gets printed by the newspaper? The employer can agree to that particular demand of employees, whether they choose to agree is another matter, but it doesn't infringe on where the board is not asking, in this case, for the employer to agree to such a provision. This isn't a bargaining case, again. All that we're asking for is the reinstatement of these employees. So the particular bargaining demand has no bearing here. Okay. Our questions are taking a little over your time. We'll give you some time for rebuttal. We'll hear from Ampersand at this time. Thank you, Your Honors, and may it please the Court. This Court's decision in Overstreet affirmed the denial of interim injunctive relief to the board on the basis that the injunction that was sought and the construction of the NLRA on which it was based raises significant risk of infringing the First Amendment. Counsel, before we get there, though, if you look at the actual injunction that has been requested, it doesn't say anything about editorial control, does it? The injunction by terms doesn't, Your Honor. Okay. And are injunctions of this nature broadly construed or narrowly construed? Well, I don't know whether they're broadly or narrowly. I mean, I suppose even if I take your assumption where I think you're going, that it would be narrowly construed. That's not the focus of our First Amendment claim here. The injunction is construed undoubtedly to require the reinstatement of the discharge reporters and the various other actions that are called for. The union's saying, you know, the red herring, this is a red herring, this First Amendment stuff, because although there may be an underlying movement of that, all we're asking for is an injunction to restore these eight people to their jobs. They have no more editorial control if the injunction is granted than they would before. Isn't there some logic behind that position? With respect, I don't think so, Your Honor, because I think what's going on here is the question whether the employer, in this case the newspaper, should be forced to withstand economic pressure to relinquish its editorial control over the content of news gathering. But isn't that the essence of union activity? Sure. In some sense it is. But I think that's precisely the point. Because in this particular context, we're what you have as a newspaper. And it's undoubtedly the case under the First Amendment that the determination of the content of the news as reported by the paper is within the province of the paper itself. But the publishers respond to economic pressure all the time. You have an advertiser who's unhappy that may cause a publisher not to take a certain position. To say that the newsroom employees have gone out and organized economic pressure doesn't say they've done something they're not entitled to do, does it? Well, they may withstand pressure at the behest of consumers, Your Honor, but those consumers aren't acting with the backing of the law. And the paper can undertake whatever actions it has and normally has at its disposal in response to that sort of consumer pressure. The reason why this case is different and the reason why the district court in our view didn't abuse its discretion, including that there's a significant risk of a First Amendment infringement here, is that here the NLRA, under the regional director's view, would give the backing of the law to the union's efforts to shift the editorial policy of the paper. Because it would insulate the union, the employees, from the normal source of disciplinary actions that the paper would take but for the application of the NLRA. What part of the injunction does that? All parts of the injunction. What the district court said is Does the injunction require the paper to change its editorial policy? No. But what the Does the injunction give the employees the power to direct the paper to change its policy? Not to direct it, but it gives them the power to pressure them to change their editorial policy. And I think what Your Honor is saying with respect is that the pressure, the ultimately, it's indirect pressure here, not direct coercion. But as we point out in our brief, both this Court and the Supreme Court have made clear in a number of contexts that indirect burdens on the exercise of First Amendment rights no less raise a First Amendment issue than direct ones. And for example, there's the case in which the Spicer v. Randle case in the Supreme Court in which the person who was sought to exercise their First Amendment rights was going to be subject to the denial of a tax exemption. That law didn't operate directly to burden the exercise of First Amendment rights. It made it more difficult because it put economic pressure on it. You rely a lot on overstreet, I know. And obviously, the facts of overstreet are quite different. Indeed, they really respond to the question that Judge Hawkins asked the counsel for the union. How does overstreet really apply here other than the magic words that it has? The facts are so different. That was union activity out of the, you know, almost a secondary boycott situation. Why should we pay any attention at all to overstreet in this context? Well, I think it directly bears on this case. And why? Because, of course, the court wouldn't draw a distinction between union First Amendment activity and newspaper First Amendment activity. They're both equally First Amendment activity. And what overstreet says is that in a situation in which you have an injunction that would raise a serious risk of infringing the First Amendment that relax the standard, that the normal standards that would attend 10-J relief don't apply and that the board has to show more in order to attain relief. And on that basis, overstreet directly applies here. And we don't think the district court abused its discretion, including otherwise. What the district court did is to base its First Amendment conclusions on two conclusions about what was going on at the paper. The first is that the central demand of the employees organizing campaign was to shift editorial discretion from management to the reporters. And that finding is not clearly erroneous and is amply supported by the record. The employees saw two respected colleagues discharged for what appeared to be a pretextual reason. In that sense, does it matter what their underlying philosophy was or what their broad concerns were? I think it does. They were in a non-union shop. They had no power to negotiate with their employer. They saw this happen and they wanted to organize so they could restore some balance between management and labor. In that sense, does it matter what the overriding issue was? I think it does, Your Honor, because what the district court found, and correctly so, is that even if you take the assumption, and this is going to be resolved in the underlying ULP action, the unfair labor practice action, but even if you take the assumption that it was union-related activity that motivated the employer to discharge these employees, you can't disaggregate the fact that the employer acted against union activity and what the union sought to achieve. And the first and most significant demand of the union, in fact, the first two demands of the union, went directly to the allocation of editorial control. They both sought to displace the demand. But it doesn't mean accomplishment of that. I mean, your client still owns the printing press and your client still ultimately controls what gets printed. The discharges didn't take place until we got into the union territory. Well, sure. But I think that would be true in any case where you have an indirect discouragement of First Amendment rights. For example, in the case where the issue was the denial of a tax exemption, it may well be that persons who want to exercise their First Amendment rights forego the economic gain from the tax exemption and then, therefore, you could say that they're not discouraged. But the court still struck down the law because it places pressure on somebody not to exercise First Amendment rights. Well, aren't the employees allowed to place pressure? I mean, the government may not be allowed to place pressure. The government may not be able to grant a tax exemption to one and not to the other. But this isn't the government we're talking about here. It's the employees. Aren't the reporters allowed to say, we don't like it done this way and we're going to let the world know about it? They have their First Amendment rights, too. They're allowed to do that in the same way  They can do it and they can face the consequences that are at the employer's disposal. What's different about this case is that the employees want to do that and they want to be insulated from any repercussions by the employer by operation of the NLRA. It's the application of the NLRA to give them the backing of the law and the injunction that would be granted that constitute the governmental action that's at issue. Well, does anyone dispute the proposition that your client could discharge a reporter because the writing was biased or even if it was only your client's perception that the writing was biased? The problem here, the ALJ has alluded, is that based on evaluations done of these reporters while Ms. McCall owned the newspaper, while she was the publisher, there did not appear to be a serious problem of bias with these reporters until the union activities came to the fore and then suddenly the conclusion is reached, well, that's bias. If you could take out the pretext part, take out the part that makes it appear that the action was prompted not by bias but by the union activity and make it clear that, no, I just don't like your writing, is there anything that would preclude your client from terminating anybody? No, I don't think so, but, Your Honor, what the district court did was it did take out the supposed pretext and it assumed that what was going on here was discharge based on union-related activity and what the district court, I think, correctly concluded was you can't disaggregate the fact that the discharge's arguendo were based on union-related activity and what the union sought to achieve. So, in other words, if the news... Well, why can't you disaggregate them? Because they're one and the same in the context of this case. Well, I'm not sure... Take this example. You've got reporters who are unhappy because of the editorial interference or what they perceive as the publisher's interference into the editorial side. Right. You also have employees that are unhappy because they look around and see some of their colleagues lose their jobs on what seems to them to be pretty flimsy basis and lack of notice and so forth. So, yes, they have an agenda that includes restoring the firewall, but they also have an agenda that's meant to say, let's have some orderly procedures and a grievance process and so forth so we don't get terminated arbitrarily. The first may not be something that the union should be working on, but the second is traditional union territory. And maybe that's what motivates the employees finally to say, well, we need some protection here to make sure we don't get knocked off in the middle of the night. What's wrong with proceeding on that fashion to say, well, we may never get the firewall negotiated this way, but at least we'll get a grievance process that we can live with. Well, sure. If the union sought that kind of negotiating strategy, we would have a different case. No, we're not two negotiations yet. We're still at the question of organization. Well, they're negotiating now, but even at the point of organization, if the union had a different organization strategy, we would have that case. But where would the union places first and foremost in front of the newspaper is a demand that the paper changes editorial policy. That's the central demand of the organizing employees. And the employer can't be blinded to that. Suppose what happened here today. I'm sorry. Go ahead and finish. Well, I think the district court recognized that. And that's why it said that there's no disaggregation between what the union sought to achieve and the supposed anti-union animus, which we can assume, argue, I know exists. Sorry, Your Honor. No, no. I didn't want to interrupt you. Suppose what happened here was that the publisher started telling reporters to report non-facts or to shade facts in a way which were materially inconsistent with the on-the-ground research the reporter had done. And that led to a union organizing effort. And the focus of the effort was to restore factual reporting integrity to the newspaper. Would we be in a different situation? Well, I don't think we'd be in a different situation as a matter of law, Your Honor, because papers are entitled to have bad papers, so to speak. And I think where you're going is that that would be a... All I need you is look around one and see that. Well, that could be the case. I don't want to speak about anyone's particular, but... Of course not. But so I think that would be a profoundly bad decision on the part of the paper. And it would presumably face some sort of commercial consequences at the end of the day, once it became known that it was reporting non-facts. But still, it's the paper's choice to make at the end of the day. That's what the Supreme Court has said in Tornillo and a number of other cases. And that's what the district court premise's decision on. It is the paper's choice to make on what the editorial content should be. Does the National Laborations Board have the power to tell this paper what to publish? No. Does any element of government? No. Could any conceivable outcome of this labor organizing effort cause that to happen? It could. How? Because if, for starters, I think where the district court was, Your Honor, is if the union can bring pressure to bear on the paper to change its editorial policy, that necessarily has an effect on content. If the union organizing effort is successful, then the editorial policy will change. But you've just told us that they can't accomplish the goal. I don't think they can accomplish it consistent with the First Amendment. I'm sorry. That's what I meant to say, that it wouldn't be lawful for anybody to try to dictate to the newspaper what its editorial policy should be. If your question is, as a matter of fact, could that happen? I think it could. What power could a union successfully organize use to change editorial policy? It could bring to bear all the resources that unions always do. The reason we have an NLRA and the reason why in the normal context unions are able to collectivize employees and engage in an organized campaign is precisely because we think those things work. It's precisely because we think by having a collective enterprise of that sort, it's going to bring significant pressure to bear on an employer to change its policies. Now, in the normal context... It's clear that newspapers aren't off limits to union organization and newspapers aren't off limits to the labor laws. So once you've got a union in place, it's certainly true they could try to exercise their power. And the law doesn't say that unions can't exercise power to influence editorial content. They can't. So I'm not sure... I mean, in one level it seems to me your argument cuts too broadly because we don't protect newspapers from unions generally. We don't. We don't protect them generally. But Associated Press carved out something very important. It said that there's no assertion in this case that the union activity and the employer's response dealt with content. And where it does, I think you've got a different case. And there's two considerations here. The district court not only found that the central animating purpose of the union campaign was to wrest editorial control away from the management, but it also found, and I think rightly, that it was an organized consumer boycott campaign that was the centerpiece, and that's the ALJ's words, that was the centerpiece of the campaign. And when we have the combination of those two considerations, the campaign that's focused on shifting editorial policy and a campaign that seeks to bring economic pressure in the form of a consumer boycott to bear on a newspaper, it at least raises a significant risk. And again, it only has to be a significant risk under Overstreet that there's an infringement of First Amendment rights. I thought their concern was separating editorial policy from news reporting. It was. Did they say control? Is the word control used? Well, I think that's Your argument just was that they were trying to extract control over editorial policy of the newspaper. That's not what they want. I think that's exactly what that says, Your Honor. And the demands bear that out on page 72 of the excerpt of record. Demand number one, restore journalism ethics to the Santa Barbara news press by implementing and maintaining a clear separation between the opinion business side of the paper and the news gathering side. I thought that's what I just said. It is, but the reason they wanted to. What part of that suggests that the employees want to control editorial policy? The fact that they want the business side of the paper to stay out of the business of determining the content of the news. By editorial policy, you don't mean that you're for or against Proposition 8 or something like that. You don't mean the content of editorials. By editorial policy, I take it you mean the firewall or the way that the company or the newspaper operates internally. That's right. Ultimately, the content that we're talking about is the content of the news reporting. Let me just follow up on Judge Hawkins' question that on excerpts of record 1208, a union-financed radio ad said, help us take back the news press. Don't let McCaw control the news. Is that what you're talking about? That's what I'm talking about. It was the design of the union was to keep the publisher from controlling the reporting of the news. So if McCaw doesn't, she's the owner, right? That's right. And I don't call her publisher. If she doesn't control it, then who does? The reporters do. And what they wanted to do was to keep the publisher from controlling the news. They wanted to control themselves. And if you look at the testimony of Ms. Burns, who was... You need to wrap up here over your time. Oh, I'm sorry. Go ahead and finish. Okay. I would point to the testimony of Ms. Burns, which is at page 82 of the ALJ's opinion, 82 of the excerpts of record, to elaborate on this point. And I don't like, if I could just say one other thing, Your Honor, which is that I don't want to leave completely unmentioned the significant delay by the board in bringing this action. But I think whatever you think about the First Amendment issue, it bears significantly on the balance of equities. Thank you. Thanks for your argument. Rebuttal? Thank you, Your Honor. Can I just... We have so little time here and your answers are very important. All we're really talking about here is the injunction, right? Yes. The NLRB is going to do whatever it's going to do with respect to the labor infractions, if it finds... Not infractions, but violations. If it finds that the Santa Barbara News Press and the Ampersand violated the law, then each of these people would presumably receive full back pay and all of the other benefits of which they were deprived, right? Yes. So all we're really... All we're talking about in this courtroom today is whether the district court abused its discretion, or if you don't like overstreep, then the standard under Miller, whether or not the district court should have granted the injunction. Isn't that correct? Yes, that's correct. So given that fact, and given the fact that injunctions have unusual overlays, how does the board address the really quite lengthy delay, a year and a half? My understanding of the record is that there was an initial request that an injunction be granted, and that was denied by, I think, the local... I guess the local council asked for it, the board, or somebody denied it. Is that correct? Yes, the board did not authorize... Okay, so basically the board initially said no injunction. We're not looking for an injunction here. So now here we are, a year and a half down the road. There's been negotiations going on between the, I gather at this point, the people trying to get the union going, and the news press. Is that correct? You're in all this time. So let's assume for a moment that the injunction is granted. What difference is that going to make at this point to the process that we're trying to protect here? Section 10J was enacted to preserve the board's remedial powers. Right, and how are those powers injured if no injunction is granted? You've already talked about, and I think the record is clear, that the people whose rights have been violated, if they have, will get all those rights. So let's assume for a moment that the injunction is not granted. How is the process injured? There's the irreparable harm to the employee's interest in union representation and to the board's remedial powers. How? Because absent interim reinstatement at this time, the employees will see that the board and the union cannot protect them, the employees who remain, and they're chill, they will experience further chill on their interest in union representation. You mean they haven't formed their views after a year and a half on that issue? Here the board exercised its, or the regional director prudently waited for the lengthy administrative proceedings to take place, the administrative hearing to place over 17 days, and then a lengthy administrative law judge decision issued and the union was certified. Based on that, you had a strong likelihood of success on the merits of succeeding with a petition. If the board or the regional director had proceeded before the administrative law judge had issued his opinion, the district court would have been faced with a voluminous 17 day record. Would you agree that there's no case on record dealing with the 10J injunction that has, where the delay has been this long? Well, there are many cases that discuss various periods of delay. They're like five months and six months and earlier. Is there anything that's been as long as a year and a half? I think we've discussed those cases in our brief, but here... What's the longest one? I believe it might be about a year. That's what I thought. But in any event, the question here is whether the irreparable harm can be prevented by reinstatement at this time. And reinstatement at this time will restore the employee's interest in union representation because they will see that prominent union supporters will be safeguarded, will be reinstated. And in addition, the union is in a particularly vulnerable position when it's bargaining for an initial contract. And during that time, if they don't have the support of the unit, and the evidence has shown that employee interest in public support of the union has waned after they've seen the discharges of eight employees. So they have their support of the union as shown by attendance at public rallies, wearing union T-shirts, wearing union buttons, has declined. But if the employees who are the primary support or the most open supporters of the union were reinstated this time, the union would have the support of those employees. And at the same time... But those people continue to be involved, do they not? Like Ms. Burns, for example, isn't she involved in the rallies and things like that? But they're not in the bargaining unit. No, I understand that. But the point is that employees will see that they face losing their livelihood if they participate in union activities. So therefore, with the reinstatement of those employees and with the support of the union, support for the union in the collective bargaining process, the irreparable harm that will otherwise ensue without the reinstatement will be foreclosed. How far away are we from a board decision? I can't answer that, and I'm sorry, I don't know. But it seems to me if the board is urging us to act quickly because they're concerned about the employee's reaction, it would behoove the board to act quickly. This seems like an incredible detour to basically to ask the courts to get involved because the board is going to take its ever-loving time in deciding what to do with this. I realize you don't speak in that capacity for the board, but it seems a little backwards. I understand your concern, but that is why Section 10J was enacted by Congress, so that But not often you have a delay as long as this. We've got, we're three years away from the events. We're a year and a half away from the slightly less than that from the ALJ's decision. For whatever reason, it's pretty far away. And to suggest that the court should act because the board itself is not going to, I'm just puzzled as to That is the reason why, though, Section 10J was enacted, so that Well, not often is there a delay of I mean, you've already told us there's no case where the delay's been as long as it was in this case, and that's not our fault. Yes, but it's also not the fault of the employees or of the union. And the focus should be on whether the status quo can be restored at this time, rather than down the road when the board issues an opinion. At this time, again, the employees' rights can be can be preserved if the primary union supporters are reinstated. Or if the board acts. Yes, Your Honor, but again, that is why Section 10J was enacted. Okay. Our questions have taken you over your time. Okay. Thank you, Your Honor. Thank you. Both of your arguments is a very interesting case, and it will be submitted for decision, and we'll stand in recess.
judges: Hawkins, Clifton, Smith